IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JALEN Z. et al.,                          :      CIVIL ACTION
                                          :      No. 13-4654
          Plaintiffs,                     :
                                          :
     v.                                   :
                                          :
SCHOOL DISTRICT OF PHILADELPHIA,          :
                                          :
          Defendant.                      :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                May 15, 2015


**Table of Contents**

I.   BACKGROUND.................................................. 3
     A.   Factual Background.................................... 3
     B.   Procedural History................................... 5
II.  CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD... 6
     A.   Standard of Review................................... 6
     B.   Discussion........................................... 8
          1.   Adequacy of the IEP............................. 8
               a.   Legal standards........................... 9
               b.   Analysis: Procedural deficiencies........ 12
               c.   Analysis: Substantive deficiencies....... 16
                    i.    Inadequate reevaluation report...... 16
                    ii.   No one-on-one aide.................. 17
                    iii.  Inadequate related services......... 18
                    iv.   Inadequate transition plan.......... 22
                    v.    No positive behavior support plan.... 24
                    vi.   Retrospective testimony of proposed
                          placement........................... 26
          2.   Denial of Pendency............................ 32
               a.   Legal standard........................... 33

       b.     Analysis................................... 34

   C.    Conclusion......................................... 42

III. MOTION FOR SUMMARY JUDGMENT............................ 43

   A.    Standard of Review................................. 43

   B.    Claim II: Section 504 of the Rehabilitation Act
       and the ADA....................................... 44

   C.    Claim III: Title VI............................... 46

   D.    Conclusion......................................... 49

IV. CONCLUSION........................................... 49

A mother and her autistic son (collectively, "Plaintiffs") bring this action against the School District of Philadelphia ("the District" or "Defendant"), claiming that the District failed to provide the son with an appropriate educational placement under the Individuals with Disabilities Education Act ("IDEA"), and that the District illegally discriminated against Plaintiffs, in violation of § 504 of the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), and Title VI of the Civil Rights Act. This case comes to the Court after the final adjudication of a due process proceeding by a Pennsylvania Special Education Hearing Officer. Before the Court are cross-motions for judgment on the administrative record and Defendant's motion for summary judgment on the non-IDEA claims. For the reasons that follow, the Court will grant in part and deny in part the cross-motions for judgment and will grant Defendant's motion for summary judgment.

## I.   BACKGROUND

### A.   Factual Background[1]

Jalen Z. ("Student") is a nine-year-old autistic boy who through 2011 had been receiving services under an early intervention individualized education program ("IEP") in the Elwyn Special Education for Early Development Success ("SEEDS") program. Compl. ¶ 52; P-1, at 3-4.[2] In November of 2011, Student's parents resolved a dispute with Elwyn over his programming--a resolution under which, inter alia, Student's IEP was modified for 2012 and he received a number of banked compensatory education hours. Compl. ¶ 54; FF ¶ 3. His parents used these banked hours to contract primarily with the Lovaas Institute to provide home-based services for Student.

In the 2012-2013 academic year, Student was scheduled to transition to a school-based program. Compl. ¶ 55. Accordingly, his mother, Lu Y. ("Parent"), began working with

---

[1]     The Court reports the following facts from the Complaint and undisputed portions of the Hearing Officer's findings.

[2]     The Administrative Record was docketed on November 15, 2013 (ECF No. 11). References to the hearing transcripts will be cited to "Hr'g Tr." References to Plaintiffs' exhibits will be cited as "P-XX." References to Defendant's exhibits will be cited as "SD-XX." References to the Hearing Officer's decisions will be cited to "Decision 1" for the February 18, 2013, decision and "Decision 2" for the May 14, 2013, decision. Findings of Fact made by the Hearing Officer will be cited as "FF ¶ XX."

the District to develop an appropriate transitional IEP. Id. ¶¶ 55-64. However, Parent objected to the resulting IEP, for substantive reasons as well as for her inability to observe a classroom similar to that in which Student would be placed. Id. ¶¶ 55-90. She ultimately rejected the District's Notice of Recommended Educational Placement ("NOREP")--the document the District uses to notify parents of a proposed IEP--and requested mediation. Id. ¶¶ 91-93. Mediation attempts were unsuccessful and, now into the 2012 school year, Parent rejected the District's offered placement at F. Amedee Bregy Elementary School. Id. ¶ 94; FF ¶ 29.

Parent ultimately filed a request for a due process hearing, Compl. ¶¶ 94-107, which took place over seven sessions from December 2012 through March 2013, id. ¶ 10. During that time, the Hearing Officer issued two decisions. In the first, an interim decision dated February 18, 2013, the Hearing Officer held that the District was not required as a matter of law to provide Student's early intervention services during the pendency of the due process proceedings. Decision 1, at 4. In the second and final decision, dated May 14, 2013, the Hearing Officer held that, although the IEP contained certain deficiencies and needed to be "refined," it was nonetheless "reasonably calculated to yield meaningful educational benefit" and provided Student a free appropriate public education

4

("FAPE") as required by the IDEA. Decision 2, at 15-16. The
Hearing Officer ordered that a number of improvements be made to
the IEP. In addition, he denied Student and Parent compensatory
education and reimbursement for their costs in providing for
Student's education during the pendency of the proceedings. Id.
at 17.

    B.   Procedural History

       On August 12, 2013, Plaintiffs brought this action
against Defendant, contesting the Hearing Officer's decision and
bringing related claims of discrimination. Specifically,
Plaintiffs allege the following: (1) error in administrative
decisions, in violation of the IDEA (Count I);
(2) discrimination, in violation of § 504 of the Rehabilitation
Act and the ADA (Count II); and (3) national origin
discrimination, in violation of Title VI (Count III). Compl.
¶¶ 131-151.

       Plaintiffs seek reversal of the Hearing Officer's two
decisions, an order amending Student's IEP to Plaintiffs'
specifications, compensatory education and/or reimbursement for
costs incurred in providing Student's educational services
during the pendency of the due process proceedings (and this
matter), damages related to the District's alleged
discrimination, and attorneys' fees and costs. Id. at 31-33.

On December 31, 2013, Plaintiffs filed a Motion to Supplement the Administrative Record (ECF No. 13), to which Defendant responded on January 17, 2014 (ECF No. 14). After holding a hearing on the matter, the Court issued an order on July 11, 2014, granting, in part, Plaintiffs' motion by admitting the evaluation and testimony of an independent speech and language pathologist. ECF No. 27. Subsequently, the parties filed cross-motions for judgment on the supplemented administrative record (ECF Nos. 29, 31) and responses thereto (ECF Nos. 33, 35), all of which correspond to Count I. Defendant also moved for summary judgment on Counts II and III (ECF No. 30), to which Plaintiffs responded (ECF No. 34). After an evidentiary hearing on November 10, 2014, at which the speech pathologist testified, the parties filed supplemental briefing. ECF Nos. 38, 41-44. The parties' motions are now ripe for disposition.

## II.  CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

### A.  <u>Standard of Review</u>

This Court has jurisdiction to review the decision of a state hearing officer under 20 U.S.C. § 1415(i). "When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as 'modified de novo' review." <u>D.S. v. Bayonne Bd. of Educ.</u>, 602 F.3d 553, 564 (3d Cir. 2010).

The Court makes its own findings by a preponderance of the evidence, Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S., 381 F.3d 194, 199 (3d Cir. 2004), but also gives "'due weight' and deference to the findings in the administrative proceedings." Bayonne Bd. of Educ., 602 F.3d at 564. This means that "[f]actual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." Id. (internal quotation marks omitted). "Specifically, . . . a District Court must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." Shore Reg'l High Sch, 381 F.3d at 199 (emphasis omitted) (internal quotation marks omitted).

Where the Court hears additional evidence, it is "free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the [IDEA]." Oberti v. Bd. of Educ. of the Borough of the Clementon Sch. Dist., 995 F.2d 1204, 1220 (3d Cir. 1993). However, "where the District Court does not hear additional evidence it must find support for any factual conclusions contrary to the ALJ's in the record before it." S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003).

Generally, the "burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 62 (2005).

As a final note, at no time in the review process may the Court "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176, 206 (1982).

B.   Discussion

Plaintiffs' primary grounds for reversing the Hearing Officer's decisions are the following: (1) the Hearing Officer incorrectly held that the IEP provided Student with a FAPE and failed to remediate the IEP in his May 14, 2013, order; and (2) the Hearing Officer improperly denied pendent placement for Student during the due process hearings and related proceedings. Compl. ¶¶ 131-145. The Court evaluates these arguments in turn.

1.   Adequacy of the IEP

Plaintiffs essentially claim that the District failed to provide Student a FAPE as required by the IDEA.

a.   <u>Legal standards</u>[3]

"A FAPE is 'an educational instruction specially designed . . . to meet the unique needs of a child with a disability, coupled with any additional related services that are required to assist a child with a disability to benefit from [that instruction].'" <u>K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist.</u>, 806 F. Supp. 2d 806, 813 (E.D. Pa. 2011) (alterations in original) (quoting <u>Winkelman ex rel. Winkelman v. Parma City Sch. Dist.</u>, 550 U.S. 516, 524 (2007)) (internal quotation marks omitted).

The IDEA does not require a FAPE to be a perfect or ideal education. Congress's purpose in enacting the IDEA was to "open the door of public education to handicapped children on appropriate terms" more than it was to "guarantee any particular level of education once inside." <u>Rowley</u>, 458 U.S. at 192. To satisfy its duty to provide a qualifying student with a FAPE, a school district must develop an IEP that responds to the student's identified educational needs by identifying the student's present abilities, goals for improvement, services designed to meet those goals, and a timetable for reaching those goals. <u>Bayonne Bd. of Educ.</u>, 602 F.3d at 557.

---

[3]     These legal standards are largely reproduced from the Court's opinion in <u>Coleman v. Pottstown School District</u>, 983 F. Supp. 2d 543, 562-68 (E.D. Pa. 2013), which provided an extensive discussion of the law applicable to IDEA claims.

Substantively, an IEP must be "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07. The "IDEA calls for more than a trivial educational benefit and requires a satisfactory IEP to provide significant learning and confer meaningful benefit." Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 247 (3d Cir. 1999) (citations omitted) (internal quotation marks omitted), superseded by statute on other grounds as recognized by P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727 (3d Cir. 2009). "More than trivial" implies more than just "access to the schoolhouse door." Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 182 (3d Cir. 1988). A school district must, in designing an IEP, identify goals for meaningful improvement relating to a student's potential. W. Chester Area Sch. Dist., 585 F.3d at 729-30. Importantly, evaluations of an IEP's adequacy can only be determined "as of the time it [was] offered to the student, and not at some later date." Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993).

Procedural violations of the IDEA, particularly in relation to an IEP, typically only justify prospective injunctive relief, not compensatory relief or tuition reimbursement. C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 66 (3d Cir. 2010). However, "a school district's failure to comply

with the procedural requirements of the [IDEA] will constitute a denial of a FAPE . . . if such violation causes substantive harm to the child or his parents." Id. Substantive harm occurs when a party can establish, by a preponderance of the evidence, that "the procedural inadequacies (i) [i]mpeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of the educational benefit." Id. at 67 (quoting 34 C.F.R. § 300.513(a)(2)) (alteration in original).

When designing an IEP for a behaviorally challenged student, school districts must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 34 C.F.R. § 300.324(a)(2)(i). Generally, the IDEA only requires a functional behavioral assessment ("FBA") "where a [student] has been identified with a disability and has an IEP in place, yet still displays behavioral problems." D.K. v. Abington Sch. Dist., No. 08-4914, 2010 WL 1223596, at *9 (E.D. Pa. Mar. 25, 2010), aff'd 696 F.3d 233 (3d Cir. 2012). Additionally, a school district must consider "positive behavioral interventions" where a student's behavior impedes his learning. 20 U.S.C. § 1414(d)(3)(B)(i). Other courts, however, have held that an FBA is not required where "the IEP sets forth other means to address the student's

problematic behaviors." <u>M.H. v. N.Y. City Dep't of Educ.</u>, 712 F. Supp. 2d 125, 158 (S.D.N.Y. 2010); <u>see also</u> <u>A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.</u>, 553 F.3d 165, 172 (2d Cir. 2009) (finding an IEP adequate, even though it lacked an FBA, where it included other behavior management strategies). Per the Second Circuit, "the sufficiency of [a district's] strategies for dealing with [problematic] behavior 'is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.'" <u>A.C.</u>, 553 F.3d at 172-73 (citing <u>Grim v. Rhinebeck Cent. Sch. Dist.</u>, 346 F.3d 377, 382 (2d Cir. 2003)).

### b.   Analysis: Procedural deficiencies

Plaintiffs first attack the District's offered IEP as procedurally deficient. They allege that, <u>inter</u> <u>alia</u>, (1) the District failed to assess Student in areas of documented need, (2) the IEP team failed to include a regular education teacher, or any teacher who would provide services to Student, (3) Parent was not included in decisions about school placement and configuration of Student's services, (4) the District decided which related services Student would receive based, not on his individual needs, but on policy and practice, (5) the placement decision was made by an administrator who never met Student and was not a member of his evaluation or IEP team, (6) Parent was not informed of the proposed program content--particularly a

proposed research-affiliated program, (7) Parent had no

information on Student's proposed classroom schedule, (8) Parent

had no information on how large the "large group" speech therapy

sessions would be, (9) Parent was given no input on the length,

composition, or frequency of Student's proposed speech therapy

sessions, (10) Parent was told she could only observe an

elementary school autistic support class after she agreed to the

placement, and (11) Parent was not provided prior written notice

identifying Student's building placement. Pls.' Br. 29-31.[4]

Defendant does not directly address these arguments, although it

does aver that Parent was aware of the District's proposed

placement from correspondence she had with a District

administrator. Def.'s Resp. 14-15. The Hearing Officer did not

find any procedural violations in the IEP-creation process.

Plaintiffs cite scant record evidence in support of

these allegations. For example, with respect to the allegation

that Student's IEP team was improperly constituted, Plaintiffs

---

[4]      For ease of reference, the Court uses "Pls.' Br." for
Plaintiffs' Brief in Support of their Motion for Judgment on the
Supplemented Administrative Record (ECF No. 29), "Def.'s Resp."
for Defendant's Response (ECF No. 33), "Def.'s Br." for
Defendant's Memorandum of Law in Support of its Motion for
Judgment on the Administrative Record (ECF No. 31), "Pls.'
Resp." for Plaintiffs' Response (ECF No. 35), "Pls.' Suppl. Br."
for Plaintiffs' Motion for Judgment on the Supplemented
Administrative Record (ECF No. 38), "Def.'s Suppl. Resp." for
Defendant's Supplemental Response (ECF No. 42), and "Pls.' Reply
Br." for Plaintiffs' Reply to Defendant's Supplemental Response
(ECF No. 44).

point only to Parent's testimony, Pls.' Br. 29 (citing Hr'g Tr. 59, 1248-53); see also Hr'g Tr. 60-62, which was contradicted by signatures of the IEP team listed on the IEP itself, SD-14, at 2. With respect to the allegation that Parent was "precluded from participation in decisions about [Student's] school placement and the configuration of his related services," Pls.' Br. 29, Plaintiffs cite to testimony from a School District speech therapist explaining that parents do not have input to the determination of the quantity of speech therapy services provided, id. (citing Hr'g Tr. 609, 633-34). With respect to the allegation that Defendant would not allow Parent to observe an elementary school autistic support class until she agreed to the placement, Plaintiffs offer only Parent's testimony. Id. at 31 (citing Hr'g Tr. 68-69). This testimony was countered by testimony from Cynthia Alvarez, a District administrator who worked with Parent, that Parent viewed a beginning-level autistic support class. Hr'g Tr. 235-39 (cited at Def.'s Br. 37). Finally, with respect to the alleged failure to provide prior written notice of the building placement, Plaintiffs cite Parent's testimony that the IEP team did not discuss the specific placement, Pls.' Br. 13 (citing Hr'g Tr. 65-67); to an email from Alvarez on June 18, 2012, directing an associate not to disclose the building placement, id. (citing SD-15, at 1); and to an email from Alvarez on August 28, 2012, notifying

14

Parent of the building placement, id. at 8 (citing P-36, at 1). Against this, Alvarez testified that her policy was to consider parent input in the placement location decision, as well as to discuss placement at the IEP meeting. Def.'s Br. 37 (citing Hr'g Tr. 287). Even assuming that Plaintiffs' general allegations are largely true, they do not by themselves establish that the IEP process was procedurally deficient.

Moreover, other than a brief reference to "deliberate indifference" and "gross mismanagement," Plaintiffs offer no argument for why these procedural violations constitute substantive harm under Cape Henlopen. Pls.' Br. 31. Plaintiffs' allegations implicate only the second Cape Henlopen factor and have not "significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child." Cape Henlopen, 606 F.3d at 67 (quoting 34 C.F.R. § 300.513(a)(2)). Parent was present at the IEP conference, Compl. ¶¶ 62-65, and did not object to the process at that time, Def.'s Br. 6.[5]

---

[5]     Plaintiffs also contend that Defendant discriminated against Parent when it did not communicate with her in her native language. Pls.' Br. 25. It is unclear how exactly Plaintiffs see this claim as fitting into the IDEA framework, other than as a procedural defect. In any event, Defendant responds convincingly by pointing to Parent's intelligible testimony at the due process hearings, without the aid of an interpreter; other witness testimony confirming that Parent could speak English; and documents prepared by Parent in

Plaintiffs' evidence does not disrupt the presumption that the Hearing Officer's factual determination is correct. In addition, the nontestimonial record evidence does not sufficiently contradict the Hearing Officer's credibility determinations--particularly those respecting Parent's testimony vis-à-vis Alvarez's. See Shore Reg'l High Sch., 381 F.3d at 199. Therefore, the Court will affirm the Hearing Officer's decision that the District's alleged procedural deficiencies did not constitute substantial harm and thus did not violate the IDEA. See Cape Henlopen, 606 F.3d at 67.

c.   Analysis: Substantive deficiencies

Plaintiffs also challenge the substance of the offered IEP, claiming that Defendant failed to provide Student a FAPE and that the Hearing Officer erred in finding the IEP to be fundamentally adequate and in ordering insufficient "refinements" to the IEP. Pls.' Br. 25-26, 31. The Court considers each of Plaintiffs' objections in turn.

i.   Inadequate reevaluation report

Plaintiffs claim that the IEP was calculated on "a stale, inadequate, and error-filled Reevaluation Report." Id. at 32. Other than this summary statement and other similar

English. Def.'s Br. 39-41. Therefore, the Court will not further consider Plaintiffs' discrimination claim here.

statements made in the Complaint, see Compl. ¶¶ 56-61,
Plaintiffs point to no evidence at all in support of this
allegation. Defendant notes that the final reevaluation report
was approved by Parent, her advocate, and Student's service
provider. Def.'s Br. 4 (citing SD-11, at 11-12 (showing
signatures)). On this evidence, there is no basis on which to
hold that the Hearing Officer erred.

ii.  No one-on-one aide

Plaintiffs claim that the IEP provided for no properly
trained one-on-one aide. Pls.' Br. 19, 32. Defendant concedes
this, although it notes that a previous offer would have
provided a one-on-one aide to assist in Student's transition to
a school-based program. Def.'s Resp. 11 (citing Hr'g Tr. 1200-
02). In addition, the parties stipulated at the May 13, 2013,
hearing to the provision of a one-on-one aide, and the Hearing
Officer included this in his order. FF ¶ 9; Decision 2, at 19;
see also Hr'g Tr. 1200-02. Finally, Defendant states that the
placement program would have included one-on-one aides as part
of the Strategies for Teaching Based on Autism Research ("STAR")
program it was implementing. Def.'s Br. 26. Despite the IEP's
failure to provide a one-on-one aide, the Hearing Officer noted
that "this issue has been/will be addressed" and that the "goals
in the IEP are wholly appropriate." Decision 2, at 15.

17

Plaintiffs have not pointed to evidence showing that the IEP's lack of a one-on-one aide justifies reversal of the Hearing Officer's decision. Accordingly, the Court defers to the Hearing Officer's finding on this issue. See Bayonne Bd. of Educ., 602 F.3d at 564.

### iii. Inadequate related services

Plaintiffs allege that the IEP's provision of related services was "ridiculously inadequate," noting that the Hearing Officer found likewise. Pls.' Br. 32 & n.21. Specifically, Plaintiffs identify as inadequate the IEP's provisions of (1) "10 sessions of school based [occupational therapy] to develop sensory strategies to be incorporated into the educational day and to conduct a fine motor assessment in the natural environment of kindergarten"; and (2) "300 minutes/IEP Term" of individual occupational therapy. P-20, at 22; see also Pls.' Br. 19-21; Pls.' Resp. 7 & n.6. The Hearing Officer found that these IEP provisions conflicted and represented a "production error"--instead, "[t]he District intended to utilize ten 30-minute sessions (for a total of 300 minutes) to assess the student in the classroom and develop [occupational therapy] services accordingly." FF ¶¶ 13-14. Plaintiffs contest this finding, arguing that, based on the testimonies, including Parent's recollection of the IEP meeting, the "IEP as written

guaranteed [Student] no more than 300 minutes . . . over the course of an entire year." Pls.' Br. 20.

Looking to the IEP, the Court notes that it is ambiguous with respect to whether these two provisions are meant to be distinct. Notably, both provisions appear to contemplate the same number of therapy sessions. See, e.g., Hr'g Tr. 918:3-9 (noting, per testimony of Amy Traviline, a District special education liaison, that the 300 minutes would typically entail ten separate sessions). Looking to the record, the Court notes that Traviline's testimony supports the Hearing Officer's position that the two provisions refer to the same intended services, see id. at 918:10-17, although there is some confusion in Traviline's response on cross-examination, see id. at 964:5-24. The testimony of Dr. Susan Huntington, a District psychologist who evaluated Student, indicates that the ten assessment sessions are typically distinct from the hours of service (i.e., the 300 minutes). See id. at 709:4-24. Finally, Parent's own testimony creates an additional discrepancy, in that she describes her understanding from the IEP meeting that the 300 minutes were intended to be provided "[f]or the whole entire semester." Id. at 63:17. This testimony is not free from inner conflict, although the Hearing Officer's finding is not an unreasonable interpretation of this and other record evidence. See Decision 2, at 16 (stating that the Hearing Officer

19

"viewed . . . the entirety of the record" in making his finding). Given that the IEP is ambiguous on this question, and no nontestimonial evidence contradicts the Hearing Officer's finding, the Court will not disturb his credibility determinations. See Shore Reg'l High Sch., 381 F.3d at 199. Accordingly, there is no basis on which to hold that the Hearing Officer erred in finding that a production error occurred in the creation of the IEP.[6]

Plaintiffs also allege that the IEP unaccountably reduced the amount of speech therapy from what Student had been receiving in his home-based early intervention program and modified it from individual to group therapy--all without completing a speech evaluation on Student. Pls.' Br. 21. The IEP provided for 600 minutes of speech and language therapy for the year, in a "large group" format. P-20, at 22. The Hearing Officer found this provision to be inadequate, called it the

---

[6]     In their argument on procedural deficiencies, Plaintiffs reference two decisions by this Hearing Officer subsequent to the decision sub judice. See Pls.' Br. Ex. 5, D.C. v. Phila. Sch. Dist., ODR No. 14229-1314KE, slip op. at 11, 12, 14 (Pa. Spec. Educ. Hearing Feb. 19, 2014) (McElligott, H.O.); id., C.H. v. Phila. Sch. Dist., ODR No. 14056-1213KE, slip op. at 15 n.7 (Pa. Spec. Educ. Hearing Nov. 11, 2013) (McElligott, H.O.). In each of these cases, the Hearing Officer appears to retreat from his earlier view that an IEP provision of related services for "X minutes per IEP term" may be appropriate. However, given that these later cases also involved other serious procedural defects not present in this case, the Court will not follow them by finding a denial of a FAPE in this case.

"largest flaw in the IEP," Decision 2, at 16, and ordered thirty minutes per week of individual speech and language therapy, id. at 19. By contrast, speech and language pathologist Ann-Michelle Albertson, in her independent evaluation and in her testimony-- both of which Plaintiffs have submitted as supplements to the administrative record--recommends that Student receive individual, fifty-minute speech therapy sessions four times a week. Pls.' Suppl. Br. 2; see also Pls.' Br. Ex. 1, Speech and Language Evaluation 3; Evid. Hr'g Tr. 9:3-8, Nov. 10, 2014, ECF No. 39.

Although Plaintiffs attempt to highlight the IEP's inadequacy by comparing it to Albertson's recommendation, such inadequacy is not in dispute. The key issue here is whether the IEP was so deficient in providing speech and language therapy that it denied Student a FAPE. As the Hearing Officer recognized--using firm language--the IEP did not provide sufficient speech therapy. Importantly, however, the Hearing Officer did not find a denial of a FAPE on this basis. Plaintiffs' proffer of the Albertson evidence does not alter this basic conclusion. Aside from uncontroversially asserting that communication is a "primary need," that Student's behavior may negatively impact therapy sessions, and that 600 minutes per year is too few, Plaintiffs do not explain why, notwithstanding the Hearing Officer's opinion, the IEP denied Student a FAPE.

See Pls.' Suppl. Br. 3-5. Moreover, as Defendant notes, Albertson admitted that Student's behavioral issues could be addressed by other professionals in his placement program, Evid. Hr'g Tr. 26:17-20, and thus may not need to be remediated solely by way of increased speech and language therapy. Def.'s Suppl. Resp. 5. The Court therefore finds that Plaintiffs' evidence, supplemented or otherwise, does not require reversal of the Hearing Officer's decision. See Oberti, 995 F.2d at 1220; Bayonne Bd. of Educ., 602 F.3d at 564.

iv.   Inadequate transition plan

Plaintiffs complain that the IEP contained no adequate plan for transitioning Student to a classroom setting. Pls.' Br. 32-33. Parent initially proposed a mixed home- and school-based program to help Student ease into a classroom environment, but Defendant "summarily rejected that proposal." Id. In support of this allegation, Plaintiffs first offer a report from Missy Kuntz, an independent behavior analyst who evaluated Student, recommending such a mixed program with one-on-one support. See P-54, at 7. As Defendant notes, however, Kuntz on cross-examination and recross admitted that the autistic support program offered to Student could appropriately address Student's behavioral needs, assuming the presence of a trained, one-on-one assistant. See Def.'s Br. 19 (citing Hr'g Tr. 457-59); see also

22

Hr'g Tr. 458:13-14 ("I think [all of Student's recommended skills] could be addressed in a one-on-one teaching style in the classroom."); id. at 482:24-483:5 ("Q. [A]ssuming the one-to-one aid is trained in discrete trial training, would the . . . School District be able to address [Student's] educational needs in the autistic support classroom on a full-time basis? A. Yes."). Second, Plaintiffs point to the testimony of Rose Hoffer, the Lovaas service provider, in which she opines that Student requires "a gradual transition to help him remain successful." Hr'g Tr. 524:21-22. Defendant, however, questions Hoffer's credibility by pointing to record evidence that downplays the extent of Student's behavioral challenges. Def.'s Br. 21-22. Finally, Plaintiffs offer a letter and testimony from Cara Garland, Student's occupational therapist, in which she recommends "a half day program with one-on-one support." P-46, at 2; see also Hr'g Tr. 1166:20-1167:17. On cross-examination, Defendant's counsel challenged this recommendation by eliciting from Garland that her experience in transitioning students was limited to one previous client. See Hr'g Tr. 1188:23-1189:3.

Although the Hearing Officer's decision does not directly discuss the IEP's lack of a transition plan, the Hearing Officer evidently did not consider that lack to operate as a denial of a FAPE. In so deciding, the Hearing Officer essentially made a credibility determination based upon, inter

23

alia, the testimonial evidence presented above. On such
evidence, the Court finds this decision to be reasonable, and
finds no nontestimonial evidence (other than the various reports
the witnesses produced and on which counsel questioned the
witnesses during the hearing) that contradicts the Hearing
Officer's determination.[7] See Shore Reg'l High Sch., 381 F.3d at
199.

### v.   No positive behavior support plan

Plaintiffs argue that the IEP did not include a
positive behavior support plan, and that the evidence fails to
establish that the District made a meaningful attempt to develop
one. Pls.' Br. 22. Defendant responds that the plan was intended
to be tentative for the commencement of the school year, and
that additional behavioral data would be needed before
finalizing a recommendation. Def.'s Resp. 8-10, 13-14. Defendant
also notes that the proposed plan did address Student's
behaviors of concern. Id. at 14.

The testimonial evidence the parties identify tends to
support Defendant's position. For example, per Traviline, the
District special education liaison, the behavior support plan

---

[7]      Plaintiffs also claim that the Hearing Officer ignored
a February 4, 2013, independent evaluation determining that
Student required a hybrid home/school program with intensive
one-on-one teaching. Pls.' Br. 24-25. However, this evaluation
was performed by Kuntz and, as shown above, was qualified by her
testimony.

was discussed at the IEP meeting, could not be completed at that time due to lack of data, and was intended to be tentative until Student could be evaluated more thoroughly upon beginning his school program. See Hr'g Tr. 922:3-924:21, 948:1-16, 956:10-957:10. Parent also recalled discussing Student's behavior at the IEP meeting--although not in depth--and it was not added to the IEP during the summer of 2012. See id. at 73:1-24. Finally, and contrary to Plaintiffs' assertion that neither Parent nor the home-based behaviorist had ever seen the positive behavior support plan, Hoffer, the Lovaas service provider, recognized the completed plan and testified that she had helped generate it. See id. at 184:8-25. In light of this testimony, and giving due weight and deference to the Hearing Officer, the Court finds that the lack of a fully defined behavior support plan at the time of the initial IEP is not a basis on which to overturn the Hearing Officer's decision. See Bayonne Bd. of Educ., 602 F.3d at 564.

vi.   Retrospective testimony[8] of proposed
      placement

Finally, Plaintiffs take issue with the Hearing

Officer's treatment of the proposed placement--particularly his

reliance on Defendant's "retrofitted" testimony related to the

STAR program and the Bregy autistic support classroom, which

"shore[d] up an otherwise deficient program and placement."

Pls.' Br. 17. Plaintiffs aver that the STAR program was

"described for the first time in testimony at the hearing," and

Parent "was never until the hearing itself given any substantive

information about the 'research-affiliated' program which the

District intended to constitute twenty to forty percent of

[Student's] program day." Pls.' Br. 23. Plaintiffs make a

similar argument in relation to the Bregy autistic support

classroom: "[T]he District did not even identify the location of

the class, let alone its content or method of operation, until

at least late August of 2012, months after its IEP offer." Pls.'

Resp. 5. The Hearing Officer's use of this evidence was

improper, according to Plaintiffs, because "the reasonableness

of an IEP must be judged on the basis of what was known at the

---

[8]      The Second Circuit, in a case cited by Plaintiffs,
notes that "retrospective testimony" "is a term of art
originated in this Circuit in 2012 to refer to testimony about
additional services that would have been provided had the parent
accepted the school district's proposed placement." Reyes ex
rel. R.P. v. N.Y. City Dep't of Educ., 760 F.3d 211, 220 n.6 (2d
Cir. 2014).

time the offer was made, and not through hindsight evidence or 'Monday [M]orning [Q]uarterbacking.'" Id. at 3-4 (quoting Fuhrmann, 993 F.2d at 1040).

Although Plaintiffs correctly identify the time as of which an IEP must be evaluated in determining whether it provided a FAPE, they miss an important qualifying factor. The Third Circuit has held that "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date." Fuhrmann, 993 F.2d at 1040. Along the same lines, "appropriateness is judged prospectively so that any lack of progress under a particular IEP, assuming arguendo that there was no progress, does not render that IEP inappropriate." Carlisle Area Sch. v. Scott P. ex rel. Bess P., 62 F.3d 520, 530 (3d Cir. 1995). At the same time, the Third Circuit allows consideration of later-acquired evidence in certain narrow circumstances: "[A] court should determine the appropriateness of an IEP as of the time it was made, and should use evidence acquired subsequently to the creation of an IEP only to evaluate the reasonableness of the school district's decisions at the time that they were made." Bayonne Bd. of Educ., 602 F.3d at 564-65; accord Fuhrmann, 993 F.2d at 1040 ("[E]vidence of a student's later educational progress may only be considered in determining whether the original IEP was reasonably calculated to afford some

27

educational benefit."). Plaintiffs fail to recognize that this exception may apply here, even though three of the cases they rely on treat the exception in detail.[9]

In R.E. v. New York City Department of Education, the Second Circuit heard three cases in which the Department of Education had offered testimony "that certain services not listed in the IEP would actually have been provided to the child if he or she had attended the school district's proposed placement." 694 F.3d 167, 185 (2d Cir. 2012). This testimony was introduced in order "to overcome deficiencies in the IEP, and the [Hearing Officer] relied on this retrospective testimony in varying degrees to find that the Department had provided a FAPE." Id. Presented with the novel question in that Circuit as to whether retrospective testimony was permissible, the court first found that "the IEP must be evaluated prospectively as of the time of its drafting." Id. at 186. But the court refused to apply a "rigid 'four corners' rule prohibiting testimony that goes beyond the face of the IEP." Id. The court elaborated:

> While testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP. For example, if an IEP states that a specific teaching

---

[9]      See Pls.' Resp. 4 (citing Reyes, 760 F.3d 211; E.M. v. N.Y. City Dep't of Educ., 758 F.3d 442 (2d Cir. 2014); and R.E. v. N.Y. City Dep't of Educ., 694 F.3d 167 (2d Cir. 2012)). The Court only discusses R.E., as the latter two cases adopt the principles set forth in that case.

method will be used to instruct a student, the school
district may introduce testimony at the subsequent
hearing to describe that teaching method and explain
why it was appropriate for the student. The district,
however, may not introduce testimony that a different
teaching method, not mentioned in the IEP, would have
been used. . . .

The prospective nature of the IEP also forecloses
the school district from relying on evidence that a
child would have had a specific teacher or specific
aide. . . . The appropriate inquiry is into the nature
of the program actually offered in the written plan.

Id. at 186-87 (citation omitted) (citing Bayonne Bd. of Educ.,

602 F.3d at 564-65). Although the Third Circuit has not had

occasion to treat this question with the same level of detail

that the Second Circuit has, district courts in this Circuit

have found the R.E. reasoning persuasive. See, e.g., T.E. v.

Cumberland Valley Sch. Dist., No. 13-643, 2014 WL 47340, at *3

(M.D. Pa. Jan. 7, 2014) (applying R.E. in affirming the Hearing

Officer's decision).

Here, the retrospective testimony exception, as

suggested by the Third Circuit in Fuhrmann and Bayonne Board of

Education, and as detailed by the Second Circuit in R.E.,

renders acceptable the Hearing Officer's consideration of

Defendant's testimony about the STAR program and the Bregy

autistic support classroom. Despite Plaintiffs' claim that the

District never notified Parent of the specific proposed

placement, or its proposed content, before the due process

hearing itself, Pls.' Br. 23, the IEP and the NOREP both list

29

the type of proposed support as "Supplemental - Autistic Support." P-20, at 32; see also id. at 27 (noting that supplemental support means "[t]he student will be INSIDE the regular classroom 79-40% of the day"). Defendant's retrospective testimony presented a more complete picture of the program. See Def.'s Br. 22-34 (summarizing testimony). Although certain elements of this testimony may not have been admissible (particularly the identities of the teachers), it was not error for the Hearing Officer to consider the program's specific structure and day-to-day routines that the testimony presented. See R.E., 694 F.3d at 186-87.

Admittedly, the IEP contains only a cursory indication of the placement, perhaps justifying Plaintiffs' reluctance to "trust [the District] to remedy any defects [in the IEP] after it has had the chance to educate [Student]." Pls.' Br. 34. However, the IEP's brief mention of the proposed support program must be read in the context of the IEP meeting and the IEP document, both of which covered the various goals and objectives the IEP team set for Student. Parent thus had some knowledge of the manner in which the District proposed to support Student, even though she did not know the exact location or contours of that program until a later date. Further, Parent pursued mediation during the summer of 2012, and it was not until the end of August of that year that the District "clarified that the

student was being offered an autism support placement at F. Amedee Bregy Elementary School." FF ¶ 29; see also Pls.' Br. 22. Parent was therefore made aware of the specific placement within the period of time in which Student's placement was still being determined, and had time to investigate further before initiating the due process hearing.

As a final matter, Plaintiffs claim the program's content is inadequate and characterize Defendant's retrospective testimony as "a tipping point in [the Hearing Officer's] determination of the appropriateness of the District's IEP offer." Pls.' Resp. 4. However, the Hearing Officer merely stated that "[t]he quality of the research-affiliated instruction weighs in favor of a finding of appropriateness of the District's program." Decision 2, at 16. There is no indication that this evidence truly tipped the scale in the Hearing Officer's estimation. Plaintiffs' criticisms of the program do not require this Court to reverse the Hearing Officer's decision, nor will the Court make a credibility determination between Plaintiffs' and Defendant's witnesses. See Shore Reg'l High Sch., 381 F.3d at 199. On this evidence, the Court sees no basis on which to find that Student was denied a FAPE.

. . . .

31

In sum, Plaintiffs have not pointed to nontestimonial evidence that would undermine the Hearing Officer's credibility determinations. See id. Neither have they argued convincingly that the IEP was not "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07. Plaintiffs, therefore, have failed to satisfy their burden as the challengers of the Hearing Officer's decision. See Schaffer, 546 U.S. at 62. Given the due weight the Court must afford the Hearing Officer's determinations, there is no basis to reverse his finding that--although it required some refinements--the IEP nonetheless offered Student a FAPE. See Bayonne Bd. of Educ., 602 F.3d at 564.

### 2.   Denial of Pendency

Plaintiffs also claim that the Hearing Officer, in his interim holding, erred when he denied pendency to the early intervention services Student continued to receive during the administrative proceeding. Compl. ¶¶ 134-135; Pls.' Br. 35 n.22.[10]

---

[10]      Plaintiffs argue in the alternative that the District did not provide Student with a FAPE and that it therefore owes Plaintiffs reimbursement for the program services Parent paid for at her own expense and compensatory education for those services she could not provide. Compl. 31; Pls.' Br. 35. The Court may order the District to reimburse Parent for the cost of placing Student in a private educational program if the Court concludes that (1) the public placement violated the IDEA by providing an inappropriate IEP, (2) the private placement was

32

a.   Legal standard

The IDEA provides that

during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j); see also 34 C.F.R. § 300.518. Known as the "stay-put" provision, § 1415(j) and its implementing regulations preserve the status quo by requiring a student to remain in "the operative placement actually functioning at the time the dispute first arises. If an IEP has been implemented, then that program's placement will be the one subject to the stayput provision." Drinker ex rel. Drinker v. Colonial Sch. Dist., 78 F.3d 859, 867 (3d Cir. 1996) (quoting Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 625-26 (6th Cir. 1990)).

---

adequate under the IDEA, and (3) Parent is not equitably barred from receiving reimbursement. Sch. Comm. of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 369, 374 (1985); Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter, 510 U.S. 7, 12, 15-16 (1993); see also 20 U.S.C. § 1412(a)(10)(C)(ii). In the instant case, the Court has affirmed the Hearing Officer's decision that the proposed placement did not deny Student a FAPE. Therefore, Plaintiffs cannot satisfy the first element of the Burlington/Carter analysis, and reimbursement is not appropriate.

b.   Analysis

Two brief paragraphs comprise the entirety of the Hearing Officer's pendency analysis:

> Here, . . . the student is transitioning from early intervention services to school-age services at the District and so involves an "initial admission to public school". [sic] The parties dispute the status of the student during that transition. Parent asserts that the student's services through early intervention are pendent and should be provided at public expense by the District. The District counters that pendency does not apply.

> In this case, because the student is not receiving services under an IEP, pendency for which the District is responsible does not apply. While a school district cannot deny a placement to a student transitioning from early intervention services where a dispute exists, parents must consent to such a placement. Obviously, the parent does not consent in this matter.

Decision 1, at 3 (footnote omitted).

Plaintiffs contest this conclusion, specifically the Hearing Officer's assumption that Student was not receiving services under an IEP--or, alternatively, was only receiving privately funded services--at the time the dispute arose. See Pls.' Br. 6-7, 18. Indeed, the Hearing Officer appears to conclude that Student's education during 2012 was not being administered according to an early intervention IEP. But Plaintiffs' evidence clearly shows that Student had been evaluated by an IEP team for the 2010-2011 school year, and that the team had developed an early intervention/preschool IEP for

34

Student and had placed him in the Elwyn SEEDS program. See P-1,
at 3-4. Student's early intervention IEP was not privately
funded, but appears to have been developed under the auspices of
and funded by the Pennsylvania Department of Education.[11] See
id.; Hr'g Tr. 15:5-9; see also 22 Pa. Code § 14.151(b)(1) ("The
Department will provide for the delivery of early intervention
services."). The pertinent question is therefore whether a
publicly funded IEP--albeit one funded by a different public
agency--is a "then-current educational placement" which the
District is responsible for maintaining during the pendency of
Student's due process proceedings and related appeal.

   The Court sees no reason why the origin of Student's
IEP should bar it from being deemed his "then-current
educational placement." Although the Third Circuit does not
appear to have confronted this exact factual scenario, the
Drinker case, cited above, relies on a Sixth Circuit case that
dealt with a similar issue. In Thomas v. Cincinnati Board of
Education, the student's IEP had not yet been implemented at the
time the dispute arose. 918 F.2d at 621-22. In the quarrel over

---

[11]    Adding a further factual wrinkle, Plaintiffs note:
"Because [Student's] Early Intervention agency had failed to
offer him a free, appropriate education prior to December 2011,
it entered into an agreement with [Student] and his mother to
provide a compensatory education fund to remedy past violations,
and to amend his IEP to prevent future ones. The IEP was duly
amended on January 2, 2012. [Exhibit P-8, pp. 4-7]." Pls.' Br. 7
n.5 (citation in original).

pendency, the parent argued that the IEP agreed to by the school district constituted the current placement, while the school district contended that the actual services the student had been receiving at the time of the dispute (i.e., those in place before the IEP's implementation) constituted the current placement. Id. at 625. Noting that Congress had not defined the term "placement" and, specifically, had not referenced the term "IEP" in the stay-put provision, the Sixth Circuit ascribed "placement" with its plain meaning: "the operative placement under which the child is actually receiving instruction at the time the dispute arises." Id. at 626. Accordingly, the court ruled in favor of the school district, since the services the student was actually receiving at the time were provided under a pre-IEP home-based services agreement. Id.

     As mentioned above, Thomas figured prominently in the Third Circuit's analysis in Drinker, a case to which Third Circuit courts continue to cite. See, e.g., M.R. v. Ridley Sch. Dist., 744 F.3d 112, 118 (3d Cir. 2014). However, the Sixth Circuit has since changed course on Thomas. In N.W. ex rel. J.W. v. Boone County Board of Education, the court recognized that, in the years since Thomas, the U.S. Department of Education promulgated a regulation defining "placement." 763 F.3d 611, 617 (6th Cir. 2014) (citing 34 C.F.R. § 300.116). Interpreting § 300.116, the N.W. court wrote:

This regulation states: "(b) The child's placement—(1) [i]s determined at least annually; (2) [i]s based on the child's IEP; and (3) [i]s as close as possible to the child's home . . . ." § 300.116(b). Moreover, "[t]he placement decision . . . [i]s made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." § 300.116(a). These definitions indicate that the school district must, in some fashion, approve of the placement decision and that the parents cannot unilaterally decide upon which school will serve as the child's "placement." Otherwise, there would be no reason to promulgate a regulation stating that the parents must have some involvement in determining the child's placement, see § 300.116(a), and that the placement will be "based on the child's IEP," see § 300.116(b). The Thomas court's approach may have been correct in 1990, but the Department of Education's promulgation of § 300.116 renders that interpretation obsolete.

Id. (alterations in original).

Notwithstanding the cogency of the N.W. court's reasoning, this Court declines to follow it in the instant case, for two reasons. First, the N.W. court emphasized § 300.116's requirement that the placement be based on an IEP. In that case, the parents became dissatisfied with their son's school district-provided IEP and unilaterally placed him in another private school to which the district had not agreed. Id. at 613. In other words, the "then-current placement" was not under an IEP at all. By contrast, Student here had an operative early intervention IEP at the time the dispute arose. Second, although

§ 300.116, N.W., and the Supreme Court[12] tend to stress that

placements should not be determined unilaterally by parents,

that concern applies with less force in this case. Parent here

did not unilaterally withdraw Student from his placement in the

District and enroll him in a private school. Instead, Parent

became concerned with the school-based placement the District

offered in the transitional IEP and decided to maintain

Student's then-current placement until Parent and the District

could reach an agreement. For these reasons, the Court finds the

facts here distinguishable from those in N.W. and finds that,

under § 300.116, Student's early intervention IEP may be

considered his "then-current educational placement."

The fact that the District itself did not develop or

fund Student's early intervention IEP does not change this

result. The IDEA conditions the states' receipt of federal

funding upon the provision of a FAPE "to all children with

disabilities residing in the State between the ages of 3 and 21,

inclusive." 20 U.S.C. § 1412(a)(1)(A). Accordingly, under

Pennsylvania's Early Intervention Services System Act, the

Pennsylvania Department of Education is responsible for "the

---

[12]     See, e.g., Carter, 510 U.S. at 12 ("Congress intended
that IDEA's promise of a 'free appropriate public education' for
disabled children would normally be met by an IEP's provision
for education in the regular public schools or in private
schools chosen jointly by school officials and parents.").

delivery of early intervention services for all eligible young children between three years of age and the age of beginners," 11 P.S. § 875-304--a responsibility which then merges with the Commonwealth's duty to provide a FAPE to school-aged children. The IDEA is therefore focused at the state level and does not distinguish between school districts within a particular state. As the Seventh Circuit has held, in a case affirming that a high school district must honor the stay-put placement with respect to an IEP developed by the elementary school district:

> IDEA is a program of financial assistance to <u>states</u> conditioned on the <u>states'</u> complying with certain requirements of the Act, such as paying for the private education of disabled children in some instances. From the Act's standpoint the state is an indivisible unit.
>
> . . . .
>
> We add that as far as expense . . . is concerned, nothing compels the State of Illinois to allow the elementary school to shift the cost of [the student's] continued stay at [his stay-put placement] to the high school district. The state can allocate financial responsibilities among school districts as it pleases, so far as the IDEA is concerned. Each state has plenary authority over its public schools and can make appropriate arrangements for cost sharing across district lines if a child transfers to another district and his parents challenge the new district's [IEP].

<u>Casey K. ex rel. Norman K. v. St. Anne Cmty. High Sch. Dist. No. 302</u>, 400 F.3d 508, 511-13 (7th Cir. 2005) (Posner, J.). The Court finds this reasoning persuasive.

Moreover, as the Third Circuit has repeatedly made clear, the IDEA displays a strong policy of protecting students by preserving the status quo when parents and school districts disagree. See M.R., 744 F.3d at 118 (noting that the stay-put rule "reflect[s] Congress's conclusion that a child with a disability is best served by maintaining her educational status quo until the disagreement over her IEP is resolved").[13] Here, the status quo is Student's primarily home-based services program. Indeed, one of the focal points of the disagreement is Parent's unhappiness with the lack of a transition plan from home-based to school-based services. Requiring Parent to uproot Student from his home-based program during the pendency of this dispute would turn on its head the IDEA's status quo policy. Parent, understandably concerned with her son's continued health and development, should not be forced "to gamble with his future" in this way. Pls.' Br. 34 (quoting T.H. v. Bd. of Educ. of Palatine Cmty. Consol. Sch. Dist. 15, 55 F. Supp. 2d 830, 840 (N.D. Ill. 1999)) (internal quotation marks omitted).

---

[13]     See also, e.g., Pardini v. Allegheny Intermediate Unit, 420 F.3d 181, 190 (3d Cir. 2005) ("[W]e think it clear that '[t]he [stay-put] provision represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved.'" (second and third alterations in original) (quoting Drinker, 78 F.3d at 864)).

Finally, "[d]uring 'the pendency' of the dispute process, the child is entitled to remain in [his] IEP-specified educational setting. Where the parents seek a change in placement, however, and unilaterally move their child from an IEP-specified program to their desired alternative setting, the stay-put rule does not immediately come into play." M.R., 744 F.3d at 118 (footnote and citation omitted) (citing Susquenita Sch. Dist. v. Raelee S. ex rel. Heidi S., 96 F.3d 78, 83 (3d Cir. 1996)); see also Sch. Comm. of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 373-74 (1985) ("[P]arents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk."). Parent here does not seek to change Student's placement--to the contrary, she seeks to maintain it. This case does not implicate the concern that Parent is attempting to "beat the system" by acting unilaterally.[14]

---

[14]     As noted above, 20 U.S.C. § 1415(j) has a second clause specifying that the child, "if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed." Parent here obviously did not consent. But, contrary to the Hearing Officer's decision, refusal to consent should not function as a bar to pendency, in light of the factual and policy considerations previously discussed.

In light of the above, the Court finds the Hearing Officer's denial of pendency to be error and will schedule a separate evidentiary hearing to determine the amount of reimbursement to which Plaintiffs are entitled.[15]

### C.   Conclusion

For the reasons stated above, with respect to the adequacy of the IEP, the Court will grant Defendant's motion for judgment on the administrative record and deny Plaintiffs' motion. With respect to the denial of pendency, the Court will grant Plaintiffs' motion for judgment on the administrative record and deny Defendant's motion. In addition, the Court will schedule an evidentiary hearing to determine the amount of reimbursement to which Plaintiffs are entitled on their pendency claim.

---

[15]   Defendant appears to argue that, even if the Court holds that pendency applies, Plaintiffs are not entitled to reimbursement, but only to the provision of "Student's early intervention IEP at a School District location." Def.'s Resp. 5. However, the Third Circuit allows reimbursement with respect to a pendent IEP. See M.R., 744 F.3d at 119 (allowing reimbursement for pendent placement); Pardini, 420 F.3d at 192 ("[W]e hold that the stay-put provision . . . required [the student] to continue to receive conductive education until the dispute . . . was resolved. Accordingly, [the plaintiffs] are entitled to the cost of the conductive education that they purchased before the dispute was resolved . . . ."). In addition, the Third Circuit has held that "the statutory language and the protective purposes of the stay-put provision lead to the conclusion that Congress intended stay-put placement to remain in effect through the final resolution of the dispute," M.R., 744 F.3d at 125 (internal quotation marks omitted)--in other words, through the end of the appeal process as well.

**III. MOTION FOR SUMMARY JUDGMENT**

Defendant's motion for summary judgment concerns the two remaining claims in Plaintiffs' case: discrimination, in violation of § 504 and the ADA (Count II); and national origin discrimination, in violation of the Civil Rights Act (Count III).[16]

A.   Standard of Review

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

---

[16]     Although the Complaint does not indicate under which provision of the Civil Rights Act Plaintiffs are suing, Plaintiffs' response to the Defendant's motion for summary judgment specifies Title VI as the relevant provision. On this basis, the Court conducts its analysis of Count III under Title VI.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

B.   Claim II: Section 504 of the Rehabilitation Act and the ADA

Plaintiffs claim that Defendant denied Student an effective education in its "gross mismanagement of and deliberate indifference to [Student's] educational program." Compl. ¶¶ 147-148. In addition, Plaintiffs contend that Defendant discriminated against Parent "for her advocacy on behalf of her son." Id. ¶ 149. For these reasons, Plaintiffs assert violations of both § 504 and the ADA.

Section § 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program

44

or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "Thus, § 504 of the [Rehabilitation Act] requires school districts receiving federal funding to provide a FAPE to each qualified handicapped person within the recipient's jurisdiction." Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 274 (3d Cir. 2014). In order to establish that a violation of § 504 has occurred, a plaintiff must show that

> (1) the student was disabled; (2) (s)he was "otherwise qualified" to participate in school activities; (3) the school district received federal financial assistance; and (4) the student was excluded from participation in or denied the benefits of the educational program receiving the funds, or was subject to discrimination under the program.

Blunt, 767 F.3d at 274-75. Importantly, the Third Circuit has held that "§ 504's negative prohibition is similar to the IDEA's affirmative duty"--in other words, a finding that a student received a FAPE under the IDEA "is equally dispositive" of a plaintiff's § 504 claim. D.K. v. Abington Sch. Dist., 696 F.3d 233, 253 n.8 (3d Cir. 2012) (internal quotation marks omitted).

Plaintiffs' ADA claim is analyzed exactly like their § 504 claim. The Third Circuit has "explained that 'the substantive standards for determining liability under the Rehabilitation Act and the ADA are the same.'" Blunt, 767 F.3d at 275 (quoting Ridley Sch. Dist. v. M.R., 680 F.3d 260, 282-83 (3d Cir. 2012)).

As discussed in detail above, the Court has affirmed the Hearing Officer's decision that the District provided Student with a FAPE. Therefore, Plaintiffs' § 504 and ADA claims under Count II must fail as a matter of law. See D.K., 696 F.3d 233, 253 n.8 (3d Cir. 2012)

C.    Claim III: Title VI

Plaintiffs also claim that Defendant, "acting intentionally and under color of law, has excluded [Parent] from full participation in decisions about her son's education on the basis of national origin by providing her with notice in English only and by failing to provide her with assistance in understanding legally significant documents it has provided to her." Compl. ¶ 151. Accordingly, Plaintiffs assert a violation of Title VI.

Title VI of the Civil Rights Act mandates that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. "Private individuals who bring suits under Title VI may not recover compensatory relief unless they show that the defendant engaged in intentional discrimination." Blunt, 767 F.3d at 272 (citing Guardians Ass'n v. Civil Serv. Comm'n of

N.Y., 463 U.S. 582, 597, 607 (1983)). A plaintiff may establish intentional discrimination by a showing of deliberate indifference. S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 263 (3d Cir. 2013). The deliberate indifference standard requires that a plaintiff prove two elements: "(1) knowledge that a federally protected right is substantially likely to be violated . . . , and (2) failure to act despite that knowledge." Id. at 265. Furthermore, "[c]onstructive knowledge is not sufficient; 'only actual knowledge is a predicate to liability.'" Blunt, 767 F.3d at 273 (quoting Zeno v. Pine Plains Cent. Sch. Dist., 702 F.3d 655, 666 (2d Cir. 2012)).

The Complaint contains few allegations of any kind of discrimination Parent may have suffered. At one point, Plaintiffs allege that Parent "had difficulty understanding the meaning and implications of legal correspondence sent to her." Compl. ¶ 95. At another, the Complaint asserts that the District failed "to provide accommodations for [Parent's] language difficulties in understanding the notice it did provide." Id. ¶ 133. Additionally, in response to Defendant's litany of reasons why it received no indication that Parent could not read, speak, or understand English, Def.'s Br. 13-20, Plaintiffs state that Defendant's "evidentiary assertions about [Parent's] English language ability amount to little more than statements

47

of school personnel who had limited contact with her to the effect that they believed that she understood them in ordinary conversation." Pls.' Resp. 8. Plaintiffs go on:

> No evidence was presented by the District about her ability to understand legal documents and notices in English. In contrast, [Parent] testified that she was not able to understand the Procedural Safeguards Notice presented to her in English, that she had difficulty communicating in English with the person on the other end of the 800 number to which the District's paperwork sent her for advice, and that she was only able to communicate her positions to the District effectively in English with the direct assistance of English-speaking individuals . . . .

Id. However, nowhere do Plaintiffs point to any evidence that Parent had notified the District of her inability to understand English "legal documents and notices." This is a crucial failure because, as noted above, Plaintiffs must show that Defendant had actual knowledge that it was likely violating a federally protected right. See S.H., 729 F.3d at 265. Defendant presented testimony that, based on its communications with Parent, it believed she could understand the English language. With no evidence showing that this assumption was incorrect, Plaintiffs cannot satisfy the deliberate indifference standard. Accordingly, because no reasonable jury could find for Plaintiffs on this evidence, there is no genuine issue of material fact and Plaintiffs' Count III must fail. See Pignataro, 593 F.3d at 268.

D.     Conclusion

In light of the above, the Court will grant Defendant's motion for summary judgment with respect to Counts II and III.

## IV.   CONCLUSION

For the foregoing reasons, the Court (1) grants Defendant's motion for judgment on the administrative record with respect to the adequacy of the IEP and denies Plaintiffs' motion for judgment on this ground; (2) grants Plaintiffs' motion for judgment on the administrative record with respect to the denial of pendency and denies Defendant's motion for judgment on this ground; (3) will schedule an evidentiary hearing to determine the amount of reimbursement to which Plaintiffs are entitled on their pendency claim; and (4) grants Defendant's motion for summary judgment. An appropriate order follows.